UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-61003-CIV-ZLOCH

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                    **O R D E R**

ABELARDO ERNEST CRUZ, NATIONS
BUSINESS CENTER, INC.,
NATIONS TAX SERVICE, INC.,
RUTH REAL, and RUTH REAL AND
ASSOCIATES, INC.,

      Defendants.
_____/

THIS MATTER is before the Court upon Plaintiff's Complaint (DE 1) filed herein. A nine day non-jury trial was held commencing Wednesday, September 3, 2008. The Court has carefully reviewed the entire court file herein and is otherwise fully advised in the premises.

## I. Background

Defendants are tax return preparers in the Miami area. In the early 1990s, during the course of the Internal Revenue Service's normal audit practice, Defendants, especially Abelardo Ernest Cruz (hereinafter "Cruz"), came under suspicion for several questionable practices. In 1995 and again in 1998, certain returns prepared by Cruz were selected for audit, and certain items were disallowed. Preparer penalties were imposed on Cruz for the positions taken on the returns. A formal investigation into returns prepared by Defendants was initiated in 2003 and was ongoing as of the date of

trial.  This investigation uncovered voluminous problems on returns prepared by Defendants, including improper deductions and exclusions and improper treatment of income.  Ultimately the IRS referred the matter to the United States Department of Justice, who initiated this action.

The subject of the investigation and trial in this action were returns prepared by Defendants for tax years 2003 through 2006.  In total 149 returns were audited, the great majority of which had deductions and exclusions from income disallowed.  The Government initiated this action seeking injunctive relief against Defendants, proceeding under three sections of the Internal Revenue Code: 26 U.S.C. §§ 7407, 7408, & 7402 (2006).  The Government seeks a permanent injunction barring Defendants from preparing tax returns or assisting in their preparation.  The relevant statutes empower the Court to grant a range of relief from enjoining prohibited conduct to barring all tax preparation services, to entering any order necessary to aid in the proper administration of the internal revenue laws.

As more fully explained below, the Court finds that Defendants have engaged in conduct that impeded the proper enforcement and administration of the internal revenue laws.  Specifically, they have knowingly taken unreasonable positions on tax returns, have knowingly aided in the preparation of returns with material misstatements on them resulting in an understatement of tax

liability, and have misrepresented their ability to practice before the IRS.  Thus, injunctive relief is proper.  However, Defendants have demonstrated that they have worked diligently to eradicate past unlawful behavior and implemented procedures designed to minimize or eliminate these types of mistakes in their tax preparation practice.  A balance of the hardships and consideration of the public interest favors keeping Defendants in business while enjoining the offending conduct.  It is also sufficient to prevent further unlawful conduct.  These conclusions are based on the type and rate of errors uncovered by the Government's investigation, as well as Defendants' efforts to eliminate the same.

After full presentation of the evidence by both sides and observing the demeanor of the witnesses, pursuant to Federal Rule of Civil Procedure 52 the Court hereby makes the following findings of fact and conclusions of law:

## II. Findings of Fact

### A. Background

1.   Defendant Abelardo Ernest Cruz (hereinafter "Cruz") works as a tax return preparer in the area of Miami, Florida.  Cruz is the primary manager and operator of Defendant Nations Business Center, Inc. (hereinafter "NBC") and Defendant Nations Tax Service, Inc. (hereinafter "NTS").  While both entities are owned by Cruz's wife Annmarie Biondolillo, she does not have an active role in the businesses.

2.    NBC was established by Cruz in the early 1990s and continues to operate to this day.  NTS was established by Cruz in late 2004 or early 2005 and likewise continues to operate.

3.    In 1993, Cruz entered a plea of nolo contendere to a felony charge in Florida state court.  The circumstances giving rise to the plea arose in 1988.  Cruz was incarcerated for six months in 1993 following the plea.

4.    Upon his release from jail, Cruz began re-building his tax preparation business.

5.    NBC was formed with the funds of Cruz's then-estranged wife.

6.    The tax return preparation business of NBC grew steadily from 1995 through 1998.

7.    NBC operated primarily as a tax preparation service through 2004.  When NTS was formed, NBC began to phase out its tax preparation practice and NTS became Cruz's main tax preparation service entity.  Since that time, NBC has been primarily engaged in the business of accounting and payroll processing for business clients.

8.    Defendant Ruth Real (hereinafter "Real") is also a tax return preparer in the Miami area.  She owns and operates Defendant Ruth Real & Associates, Inc., a tax preparation service serving about thirty (30) clients.

9.    In addition, Real works as an employee of both NBC and

4

NTS. She prepares tax returns for clients of all three businesses, and she purports to represent clients of NBC, NTS, and Ruth Real & Associates, Inc. in audits of their tax returns by the Internal Revenue Service.

### B. Previous audits and penalties

10. In or about 1995, Internal Revenue Agent Alice Denny (hereinafter "Denny") audited several tax returns prepared by NBC for tax years 1993 and 1994 that claimed a credit for payment of fuel taxes. Denny disallowed the fuel tax credits and proposed a preparer penalty against Cruz for each return.

11. At the same time, Internal Revenue Agent Joanne Leavitt (hereinafter "Leavitt") audited several tax returns prepared by NBC that claimed a credit for fuel taxes. Leavitt also disallowed the credits and asserted preparer penalties against Cruz.

12. In total there were about fourteen penalties proposed against Cruz.

13. Cruz believed the fuel tax credits were properly taken, or at least were not unreasonable positions, and filed the necessary paperwork to take his proposed penalties to the IRS appeals office.

14. The IRS and Cruz settled the matter at appeals. Seven preparer penalties were conceded by Cruz and the remaining seven were dropped.

15. The settlement was reached based upon the parties'

assessment of the hazards of litigation before the United States Tax Court.

16. In 1996 and 1998, the IRS again reviewed additional samples of returns prepared by NBC. It found that Cruz incorrectly placed Schedule C income on the front of Form 1040 and incorrectly placed income subject to self-employment tax on Schedule E. Both actions resulted in an understatement of tax liability.

17. On May 7, 1998, the IRS revoked Cruz's eligibility to represent taxpayers in audits or appeals. See Government Exhibit 46.

18. This censure was based on several instances of "disreputable conduct," including Cruz's plea of nolo contendere, see ¶ 3, a determination by a bankruptcy court that Cruz embezzled over $680,000, and the preparer penalties previously discussed.

19. Cruz was also barred from participating in the IRS's e-filing program due to the criminal conviction following his nolo contendere plea.

20. During the five year period of time from 1998 through 2002, NBC prepared over 10,000 income tax returns. Cruz signed each return as the preparer.

21. Five preparer penalties were assessed against Cruz for mistakes contained in five of the 10,000 returns.

22. No further preparer penalties were assessed against Cruz.

23. No preparer penalty has ever been assessed against Ruth

Real.

## C. Defendants' Practices

24.  Prior to 2005, NBC's tax preparation services worked as follows: Clients were seen by appointment and first met with a staff member would interview the client and input the data into tax preparation software on a computer to generate a tax return.  The initial interviewers were given no formal tax training or education.  Cruz would review the tax return with the client, input any additional data needed, and sign the return as the preparer. Cruz's review was not a line-by-line audit of the draft tax return. Nevertheless Cruz maintained the ability to change any of the information previously entered by the interviewer.

25.  NBC did not maintain any sort of general quality control procedure after tax returns were prepared and did not maintain receipts or other substantiation for the returns it prepared for its clients.  No written record was made of the information provided by the taxpayer.

26.  It was common for at least some of the information provided by the client to the interviewer to be provided orally, that is, without documentary support.

27.  In the discretion of the interviewer or Cruz, the orally provided information would either be accepted or supporting documentation was requested.

28.  In some instances NBC refused to prepare a return or

7

enter an item thereon absent substantiation by supporting documents.

29. As of September of 2004, NBC did not have any procedures for documenting client verification of the information on the tax returns that might have occurred. That is, the client would not sign any acknowledgment that the return was accurate or that the client has indeed provided the information that ultimately appeared on the return. Nor did NBC have any procedure for documenting any inquiry made by the interviewer or Cruz with respect to supporting documentation or predicate facts necessary to support any particular deduction.

30. During the years at issue, tax years 2003-2006, there was no requirement for the tax return preparer to audit clients' tax returns or maintain the clients' supporting documentation.

### D. Facts Preceding the Investigation

31. Denny was promoted to Return Preparer Coordinator for South Florida. When promoted, there were ongoing audits of returns prepared by NBC, and they were referred to Denny. In 2003, Denny named Cruz and NBC in a referral letter sent to the IRS's Lead Development Center ("LDC"), a group that reviews recurring problems to determine whether further action against a preparer is warranted.

32. Denny's referral letter reflects that the request for authority to investigate Cruz and NBC was partly based upon the

8

seven income tax returns prepared approximately ten years earlier in 1993 and 1994 claiming a fuel tax credit and resulting in seven sustained preparer penalties.  Gov. Ex. 92.

33.  The referral letter also noted that the percentage of returns Cruz prepared that receive tax refunds was well above the national average of returns to receive refunds.

34.  Though Denny drafted the referral letter in 2003, it contains statistics purporting to be for 2004.

35.  Denny's referral letter stated that Cruz was a convicted felon.  It also claimed, erroneously, that Cruz had a grand theft conviction for making unauthorized charges on his father's credit card.

36.  In the fall of 2004, the LDC authorized Denny to commence an investigation of Cruz and NBC.

37.  Leavitt was tasked with leading the investigation.

38.  Leavitt met with Cruz in September of 2004.  NTS was not established as of this meeting.  Cf. supra, ¶ 2.

39.  At the meeting, Leavitt told Cruz she was conducting an investigation; they discussed Cruz's business practices, his tax knowledge, and other matters relevant to her investigation. Leavitt requested NBC's entire client list.  Gov. Ex. 43.

40.  Cruz provided all of the information requested.  When Cruz asked for details about the investigation, Leavitt would not provide him with any information.

41.   Following   this   first   meeting,   Leavitt   began   her investigation.   See infra, ¶¶ 49, et seq. below.

42.   Leavitt met with Cruz again in the Fall of 2006.  Gov. Ex. 66.   At this time, based in part on the original returns selected for audit, Leavitt identified several types of repetitive problems on the returns prepared by NBC/NTS.  Prior to this second meeting,   Leavitt   informed   Cruz   of   the   Internal   Revenue   Code sections that she considered to be problem areas on the returns prepared by NBC/NTS.

43.   At the second meeting Cruz provided Leavitt with various materials in an attempt to show NBC/NTS's compliance with respect to these Code sections.  Gov. Ex. 67.

44.   Following   the   second   meeting   Cruz   again   provided additional   materials   to   Leavitt   in   an   attempt   to   show   his compliance with the Code sections identified to be problem areas. Gov. Ex. 68.

45.   Leavitt considered all the materials that Cruz presented in her analysis.

46.   During the course of the investigation, Leavitt also met with Real in the same manner that she met with Cruz.  Gov. Ex. 69. During this meeting, numerous issues were discussed, and Leavitt requested a list of clients that Real serviced through Ruth Real & Associates.

47.   Pursuant to 26 U.S.C. § 6107(b), tax return preparers are

10

required to either keep copies of the returns that they prepared in the last three years or to keep a client list with certain required information.

48.  Real was unable to provide Leavitt with either copies of the returns or a client list with the required information because the computer containing this information had crashed.  See Gov. Ex. 80.

### E. The Investigation

49.  As referenced in Paragraphs 39 and 40 above, after their initial meeting in September of 2004, Cruz provided Leavitt with NBC's client list.

50.  Leavitt randomly selected twenty-five returns.

51.  Of these returns, she excluded four because the taxpayers lived outside of Florida and could not be readily audited.  Of the remaining twenty-one, Leavitt identified thirteen that had large or questionable deductions or exclusions.  She kept these to be audited and returned the balance to NBC.

52.  Leavitt then selected seventeen more returns using the IRS's DIF program.

53.  DIF is a computer program that identifies returns with large or unusual items probable to be questioned during an audit.

54.  The total thirty returns selected for audit were assigned to approximately thirty Revenue Agents and Tax Compliance Officers be audited.

55.  As the investigation continued over the course of the next several years, Leavitt selected additional returns for audit.

56.  Ultimately, 149 income tax returns prepared by NBC and NTS during 2003, 2004, 2005, and 2006 were audited.

57.  There were over forty IRS employees conducting the audits.  Leavitt remained in charge of the investigation.

F. Audit Results

58.  During the course of the investigation numerous repetitive problems were identified on the audited returns.

59.  These repetitive problems included improper and unsubstantiated deductions taken pursuant to § 179, failure to apply limits on the deduction of vehicles pursuant to § 280F, double counting of deductions, improper treatment of closing costs for the purchase of property, overstated Schedule C expenses, fabricated casualty losses, and others.

60.  Section 179 allows a taxpayer to deduct the expense of certain depreciable business assets in a single taxable year, but § 280F places a limit on the amount that may be deducted under § 179 for passenger automobiles.

61.  The Government presented numerous examples of tax returns where NBC/NTS did not correctly take § 179 deductions.  E.g., Gov. Ex. 1, p. US10403 (Lopez tax return) (Gov. Ex. 94, ¶ 73); id. p. US10924 (Pineda tax return) (Gov. Ex. 94, ¶ 87); id. p. US10566 (Sandra Cruz tax return); id. p. US10726 (Delgado tax return); Gov.

Ex. 94, ¶¶ 67, 99, and 108.

62.   Any basis in a vehicle not deducted under § 179 is to be depreciated over five years.  26 U.S.C. § 168(e)(3)(B)(i).

63.   In certain instances NBC/NTS impermissibly depreciated vehicles over three years instead of five.  E.g., Gov. Ex. 1, p. US10287 (Hernandez tax return); id. p. US10566 (Sandra Cruz tax return) (Gov. Ex. 94, ¶ 27).

64.   NBC/NTS prepared a large number of returns with improper § 179 deductions for truck purchases and truck overhauls.

65.   These included numerous § 179 deductions that were unsubstantiated.  In some cases the returns claimed a large § 179 deduction for the purchase of a truck in one year and also a large § 179 deduction for an overhaul of the truck in the following year, or the returns claimed deductions for major overhauls in back to back years.  E.g., Gov. Ex. 94, ¶¶ 13, 29, 37, 38, 57, 61(b), 93, and 105.

66.   NBC/NTS also claimed deductions twice on the same return in some instances.  E.g., Gov. Ex. 1, p. US10827 (Covington/Affordable Borders, Inc. tax return) (Gov. Ex. 94, ¶ 25).

67.   NBC/NTS also impermissibly deducted closing costs for the purchase of real property.  Gov. Ex. 94, ¶ 9 (Amado tax return); id. ¶ 95 (Robaina tax return).

68.   Closing costs should not be deducted as expenses but

added to the taxpayer's basis in the property.  IRS Pub. 530, p. 9 (2007).

69.  On some returns, NBC/NTS also deducted amounts paid for the repayment of loan principle.  _E.g._, Gov. Ex. 94, ¶ 40(b) (William Forde PA tax return).  There is no deduction allowed for repayment of principle on a loan.

70.  NBC/NTS also prepared corporate returns that claimed deductions for an officer's compensation but then failed to include that officer's compensation as income on the officer's personal returns.  _E.g._, Gov. Ex. 94, ¶ 44.

71.  NBC/NTS improperly reported a corporate officer's compensation on at least one individual tax return that listed it in a manner that avoided the requirement for the corporation to pay employment taxes on the income.  _E.g._, Gov. Ex. 94, ¶ 51.

72.  NBC/NTS also improperly deducted an automobile expense on at least one corporate return when the automobile was owned by the shareholder and not the corporation.  _E.g._, Gov. Ex. 94, ¶ 83(b).

73.  NBC/NTS also prepared at least one return that did not report any salary paid to a corporate officer but did report distribution income.  _E.g._, Gov. Ex. 94, ¶ 101.  It is improper for an officer of a closely held corporation to receive only distributions and no salary.  Rev. Rul. 74-44 1974-1 C.B. 287.

74.  NBC/NTS prepared returns that impermissibly claimed a deduction for a leasehold improvement on returns that also claimed

a deduction for mortgage interest.  <u>See, e.g.</u>, Gov. Ex. 16 (Gopalgi tax return, Schedule C, line 13 and Schedule A, line 10);  Gov. Ex. 24 (Negret tax return, Schedule C, line 13 and Schedule A, line 10).

75.   To claim a deduction for money expended on an improvement to leased real property, the real property must be a non-residential leasehold estate.  26 U.S.C. § 168(i)(8)(A).

76.   The deductions for mortgage interest on the returns noted in ¶ 74 made it clear that the real property for which the leasehold improvement deduction was claimed was not leasehold property, because mortgage interest can only be deducted for residential real property.  26 U.S.C. § 163(h).

77.   The actions recounted in Paragraphs 61, 63, 65, 66, 67, 69, 70, 71, 72, 73, and 74 resulted in an understatement of the taxpayers' tax liabilities and a loss to the United States Treasury.

G. Non-audit Investigation Facts

78.   On July 18, 2007, the Government issued a press release that recited the positions taken its Complaint filed herein.  Def. Ex. 12.   The release did not make light of the Government's understanding of Defendants' practices.

79.   In or about January 2008, Leavitt sent letters to 80 of the clients of NBC/NTS who were being audited in this investigation stating that the Department of Justice was seeking to enjoin

Defendants from preparing tax returns and providing any sort of tax representation or advice.  See, e.g., Def. Ex. 35.

80.   In general, the letters stated the nature of items on the sample of returns that were disallowed by the IRS and asked the taxpayers if they told Cruz or the staff at NTS the information for the item that the IRS had disallowed on the taxpayer's return in particular.

81.   Eight taxpayers replied to the letter.

82.   Leavitt called the other taxpayers on the telephone, and another 7 agreed to talk to her.

H. National Statistics Published by the IRS

83.   IRS-published statistics reflect that for tax year 2004, the average recommended additional tax resulting from audits of tax returns with Schedule C total gross receipts between $25,000 and $100,000 was $6,629 when the audit was conducted by a Revenue Agent.  Def. Ex. 27.

84.   IRS-published statistics reflect that for tax year 2004, the average recommended additional tax resulting from audits of tax returns with Schedule C total gross receipts between $25,000 and $100,000 was $12,323 when the audit was conducted by a Tax Examiner.  Id.

85.   IRS-published statistics reflect that for tax year 2004, the average recommended additional tax resulting from audits of tax returns with Schedule C total gross receipts between $25,000 and

16

$100,000 was $1,994 when conducted through the mail, known as a correspondence audit.  Id.

86.  IRS-published statistics reflect that for tax year 2004, the average recommended additional tax resulting from audits of tax returns with Schedule C total gross receipts over $100,000 was $20,956 when conducted by a Revenue Agent.  Def. Ex. 27.

87.  IRS-published statistics reflect that for tax year 2004, the average recommended additional tax resulting from audits of tax returns with Schedule C total gross receipts over $100,000 was $55,330 when conducted by a Tax Examiner.  Id.

88.  IRS-published statistics reflect that for tax year 2004, the average recommended additional tax resulting from audits of tax returns with Schedule C total gross receipts over $100,000 was $2,892 when conducted as a correspondence audit.  Id.

89.  IRS-published statistics reflect that for tax year 2005, the average recommended additional tax resulting from audits of tax returns with Schedule C total gross receipts between $25,000 and $100,000 was $9,713 when conducted by a Revenue Agent.  Def. Ex. 28.

90.  IRS-published statistics reflect that for tax year 2005, the average recommended additional tax resulting from audits of tax returns with Schedule C total gross receipts between $25,000 and $100,000 was $5,801 when conducted by a Tax Compliance Officer.  Id.

17

91.   IRS-published statistics reflect that for tax year 2005, the average recommended additional tax resulting from audits of tax returns with Schedule C total gross receipts between $25,000 and $100,000 was $7,443 when conducted as a correspondence audit.   Id.

92.   IRS-published statistics reflect that for tax year 2005, the average recommended additional tax resulting from audits of tax returns with Schedule C total gross receipts over $100,000 was $37,024 when conducted by a Revenue Agent.   Id.

93.   IRS-published statistics reflect that for tax year 2005, the average recommended additional tax resulting from audits of tax returns with Schedule C total gross receipts over $100,000 was $4,641 when conducted by a Tax Examiner.   Id.

94.   IRS-published statistics reflect that for tax year 2005, the average recommended additional tax resulting from audits of tax returns with Schedule C total gross receipts over $100,000 was $21,032 when conducted as a correspondence audit.   Id.

95.   IRS-published statistics reflect that for tax year 2004, the average recommended additional tax resulting from audits of all non-business returns, except 1040A, with total positive income[1] between $50,000 and $100,000 was $7,975 when conducted by a Revenue Agent.   Def. Ex. 27.

---

[1] "Total positive income" is defined by the IRS as "the sum of all positive amounts shown for the various sources of income reported on the individual income tax return and, thus, excludes net losses."   Def. Ex. 27, p. 2, ¶ 10.

96.  IRS-published statistics reflect that for tax year 2004, the average recommended additional tax resulting from audits of all non-business returns, except 1040A, with total positive income between $50,000 and $100,000 was $5,823 when conducted by a Tax Examiner.  Id.

97.  IRS-published statistics reflect that for tax year 2004, the average recommended additional tax resulting from audits of all non-business returns, except 1040A, with total positive income between $50,000 and $100,000 was $2,299 when the audit was conducted as a correspondence audit.  Id.

98.  IRS-published statistics reflect that for tax year 2005, the average recommended additional tax resulting from audits of all non-business returns, except 1040A, with total positive income between $50,000 and $100,000 was $11,098 when conducted by a Revenue Agent.  Def. Ex. 28.

99.  IRS-published statistics reflect that for tax year 2005, the average recommended additional tax resulting from audits of all non-business returns, except 1040A, with total positive income between $50,000 and $100,000 was $7,286 when conducted by a Tax Examiner.  Id.

100. IRS-published statistics reflect that for tax year 2005, the average recommended additional tax resulting from audits of all non-business returns, except 1040A, with total positive income between $50,000 and $100,000 was $1,902 when conducted as a

19

correspondence audit.  Id.

### I. 2003 audit results

101. The Government's investigation consisted of audits of a sample of 149 returns prepared by Defendants.  See ¶¶ 49-56.

102. The sample of 149 returns in the Government's investigation included 46 prepared by NBC/NTS for tax year 2003. Def. Ex. 23.

103. These returns represent 1% of the approximate 4,600 returns that Defendants prepared for that year.

104. Only returns with large or unusual items and/or high DIF scores were selected for audit.

105. The average loss established by the 46 returns audited for tax year 2003 is $7,658.83.  Def. Ex. 23.

106. This number is reasonably close to the average recommended additional tax figures published by the IRS for subsequent years.  See Def. Exs. 27 & 28.

107. Of the 46 returns audited for tax year 2003, 10 are reflected as cases were the taxpayer failed to appear and the additional tax was assessed.  Def. Ex. 23.

108. Two of the remaining 36 audits resulted in no change. Id.

109. Five of the remaining 34 returns audited for the tax year 2003 remained pending in Appeals as of the time of trial in this matter.  Id.

110. A majority of the returns had additional taxes asserted because the taxpayer failed to produce documentation necessary to substantiate deductions taken on the returns.

### J. 2004 audit results

111. The Government audited 86 returns for tax year 2004. Def. Ex. 24.

112. These returns represented 1.7% of the approximate 4,960 returns that Defendants prepared for that year.

113. Only returns with large or unusual items and/or high DIF scores were selected.

114. The average loss established by the 86 returns audited for tax year 2004 is $7,858.94. Def. Ex. 24.

115. This does not depart very far from the average recommended tax loss estimated by IRS-published statistics. Def. Ex. 27.

116. Of the 86 returns audited for tax year 2004, 7 taxpayers failed to appear. Def. Ex. 24.

117. Of the remaining 79 returns audited, 2 were determined to have no change. Id.

118. Of the 86 returns audited for tax year 2004, 19 taxpayers remained pending in Appeals as of the time of trial in this matter. Id.

119. A majority of the returns had additional taxes asserted because the taxpayer failed to produce documentation necessary to

substantiate deductions taken on the return.

### K. 2005 audit results

120. The Government audited 61 returns for tax year 2005. Def. Ex. 25.

121. These returns represented about 1.3% of the over 4,500 returns Defendants prepared for that year.

122. Only returns with large or unusual items and/or high DIF scores were selected.

123. The average loss established by the 61 returns audited for tax year 2005 was $9,711.18.  See Def. Ex. 25.

124. This is within the average additional tax recommended by IRS-published statistics.  See Def. Ex. 28.

125. Of the 61 returns audited for 2005, 5 taxpayers failed to appear.  Def. Ex. 25.

126. Of the 56 remaining returns, 19 remained pending in Appeals as of the time of trial in this matter.  Id.

127. Of the 37 remaining returns a majority had additional taxes asserted due to the failure of the taxpayers to produce documentation necessary to substantiate deductions taken on the return.

### L. 2006 audit results

128. The Government audited 31 returns for tax year 2006.

129. These returns represented less than 1% of the approximate 5000 returns Defendants prepared for that year.

130. Of the 31 returns audited for 2006, 7 resulted in no change.  Def. Ex. 26.

131. Of the remaining 24 returns audited for 2006, 5 remained pending in Appeals as of the time of trial in this matter.  Id.

132. A majority of the remaining 19 returns had additional taxes asserted due to the failure of the taxpayers to produce documentation necessary to substantiate deductions taken on the return.

133. The average tax loss established by the 31 returns audited for tax year 2006 was $5,620.65.

134. Neither Party submitted figures for IRS-published statistics for 2006.  However, assuming figures from the two previous years provide an adequate benchmark, the figure noted in Paragraph 136 is reasonably close to or below the average recommended additional tax figures published by the IRS for preceding years.  See Def. Exs. 27 & 28.

M. Conclusions To Be Drawn From the Investigation

135. The kind and quantity of errors found on the sample of 146 audited tax returns is reflected in the following table:

|  | Number of returns in 2003 sample (& percent of total) | Number of returns in 2004 sample (& percent of total) | Number of returns in 2005 sample (& percent of total) | Number of returns in 2006 sample (& percent of total) |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Total returns | 46 | 86 | 61 | 31 |
| Schedule C depreciation | 23 (50%) | 23 (27%) | 4 (6.6%) | 0 (0%) |
| Schedule C expenses | 24 (52%) | 37 (43%) | 17 (29%) | 5 (16%) |
| Earned income credit | 10 (22%) | 18 (21%) | 11 (18%) | 1 (3.2%) |
| Child tax credit | 11 (24%) | 14 (16%) | 6 (9.8%) | 1 (3.2%) |
| Add'l child tax credit | 7 (15%) | 20 (23%) | 10 (16%) | 1 (3.2%) |
| Education credit | 7 (15%) | 7 (8.1%) | N/A | 0 (0%) |
| Casualty/ theft loss | N/A | N/A | 17 (28%) | 4 (13%) |
| Foreign- earned income exclusion (§ 911) | N/A | 10 (12%) | 6 (9.8%) | 0 (0%) |
| Employee business expenses | 8 (17%) | 16 (17%) | 7 (11%) | 0 (0%) |
| Schedule E expenses or flow-through | 13 (28%) | 15 (17%) | 4 (6.6%) | N/A |

| Form 4797 loss | 3 (6.5%) | 5 (5.8%) | 2 (3.2%) | 0 (0%) |
|---|---|---|---|---|

See Def. Exs. 23-26.[2]

136. The losses shown by mistakes and errors on the sample of 149 returns establish that Defendants' actions caused losses to the United States Treasury.

137. Defendants' Exhibits 23-26, as summarized in the chart above, demonstrate that the instances of errors uncovered in the Government's investigation of the sample of 146 returns diminished as the investigation continued.

138. The timing of the decline in these problems coincided with Defendants' knowledge of the Government's investigation and ability to address and correct problems.  See ¶¶ 38-42.

139. During the years at issue, NBC/NTS prepared approximately 4,800 returns each year.

140. NBC/NTS prepared over 4,600 tax returns for 2003.  A total of 360 returns reported casualty loss claims (7.8% of total), 63 returns claimed the foreign earned income exclusion (1.4% of total), and only 148 returns were tax returns of truckers with Schedule C expenses and/or depreciation expenses (3.2% of total).

141. NBC/NTS prepared 4,960 tax returns for 2004.  A total of 528 returns reported casualty loss claims (10.6% of total), 78 returns claimed the foreign earned income exclusion (1.6% of

_____

[2] Items marked "N/A" do not appear on the Exhibit noted.

25

total), and only 144 returns were returns of truckers with Schedule C expenses and/or depreciation expenses (2.9% of total).

142. Following the 7 preparer penalties imposed for returns prepared in 1993 and 1994, Defendants have not filed any return claiming the fuel tax credit for a trucker.

143. During the entire period of this investigation, and indeed since 1998, no preparer penalty was ever assessed against Cruz.

144. As stated previously, no preparer penalty has ever been assessed against Real.

N. Comparison With National Facts

145. Testimony by IRS employees at trial established that a high percentage of tax returns audited nationwide result in additional taxes proposed.

146. Approximately 90% of audits conducted by Revenue Agents, Tax Examiners, and Tax Compliance Officers result in additional taxes being proposed.

147. The major areas resulting in additional taxes after audit include:

A)   Depreciation;

B)   Schedule C expenses;

C)   Employee business expenses, including automobiles;

D)   Casualty losses; and

E)   Foreign-earned income exclusions.

148. The areas that result in additional taxes throughout the United States are the same areas that the Government has identified as areas of concern on Defendants' returns.

149. The rate of audits resulting in no change to the returns prepared by Defendants is consistent with the rate of audits resulting in no change to returns filed nationally.

### O. Audit Representation

150. NBC and NTS provided audit representation services to their clients.

151. They have stopped accepting new engagements for representation before the IRS, but they continue to represent any previously engaged taxpayers.

152. During an audit, a taxpayer may choose to be represented by a Power of Attorney (hereinafter "POA"), sometimes called a "representative."

153. A taxpayer may appoint a POA by submitting IRS Form 2848 to the IRS.  Once appointed, the POA can act on behalf of the taxpayer during the audit.  The POA can speak directly with the IRS employee who is conducting the audit, and these conversations often occur outside the presence of the taxpayer.  The auditor can discuss substantive matters with the POA, and the POA can address any issues or concerns that the auditor might raise throughout the course of the audit.

154. In contrast to appointing a POA, a taxpayer may also

merely authorize the release of tax return information to a third party by submitting IRS Form 8821.   Form 8821 authorizes the release of taxpayer information to the specific third party named therein.  This Form does not appoint the named third party as a POA or authorize that person to act as such.

155. The IRS places restrictions on the people who may be appointed as a POA.   This is with good reason, partly to ensure that the taxpayer receives competent representation during the course of the audit.

156. CPAs and attorneys are permitted to act as POAs before the IRS.   Additionally, enrolled agents can also represent taxpayers in audits before the IRS.

157. In order to be an enrolled agent, one must demonstrate competence in tax matters by passing an IRS-administered exam and a background examination.  An enrolled agent may be appointed as a POA in an audit regardless of whether that person actually prepared the tax return that is being audited.

158. An "unenrolled" preparer is one who is not specifically enrolled by the Internal Revenue Service.  An unenrolled preparer may only be appointed as a POA in an audit where the unenrolled preparer prepared and signed the return that is being audited. Even where an unenrolled preparer has signed the return that is being audited, that person may not represent the taxpayer in the IRS appeals process.

159. As previously discussed, in 1998 the IRS barred Cruz from representing any taxpayers in audits before it. See supra ¶ 17; Gov. Ex. 46.

160. As Cruz is no longer permitted to represent clients before the IRS in audits, NBC and NTS provide these services through Defendant Real. No other employee of NBC or NTS is an enrolled agent.

161. Real is an unenrolled preparer because she has not passed the examination or background check to be enrolled.

162. Nevertheless, Real has submitted Form 2848 in cases where she is not qualified to be the POA because she did not prepare the return that is being audited. In other cases Real simply submitted a Form 8821.

163. In some cases when Real submitted a Form 8821, she would still accompany the taxpayer to meetings with the auditor. Although not permitted to do so, she would participate in substantive discussions with the auditor.

164. In other instances where only a Form 8821 was filed Real would attend meetings with the auditor outside the presence of the taxpayer.

165. While it is clear Real either did not understand the difference between Forms 2848 and 8821, or purposely misused them, the evidence established that IRS employees also failed to grasp the difference and proper procedure. See Def. Ex. 31 (email from

Leavitt stating: "I have constantly seen both [Tax Compliance Officers] and [Revenue Agents] allowing Ruth Real to function as POA when she has only submitted Form 8821.  I have tried to talk to various people individually to drive home the important distinction between Forms 2848 and 8821, but sometimes I feel like I'm hitting a brick wall.").

166. This failure on the part of the IRS to appreciate the difference between Forms 2848 and 8821 is also evidenced by the fact that it allowed Real, without penalty, to engage continuously in the very acts of improper representation of which it now complains.

167. Real was the legitimate third party designated by Form 8821 and was the legitimate unenrolled representative for a great many of Defendants' clients being audited by the IRS.

168. Real found it increasingly difficult to comply with all of the scheduling and document request demands placed on her by the volume of audits conducted by the Government.

169. In numerous instances, IRS employees failed to work reasonably with Real in the conduct of their audits.  In one case Real was excluded from an audit meeting with an IRS employee even though she was permitted by IRS procedure to be present at the audit because the taxpayer filed Form 2848 and Real prepared the return.

P. Engagement Letter

30

170. NBC and NTS use an engagement letter with their clients. E.g., Gov. Ex. 87.

171. The testimony at trial established that identical letters were sent to each client for the purposes of obtaining their consent to Defendants' representation during audit and to receive information about the taxpayer from the IRS.

172. This letter expressly states that for a fee NTS will represent the taxpayer at audits with the IRS and "at the appellate level, if an appeal is necessary." Id.

173. The letter states that Form 8821 is attached, but misnames it "Authorization and Declaration of Representative."

174. Form 8821 is actually titled "Tax Information Authorization."

175. The letter is sent over Cruz's name, with a copy to "Ruth Real/Representative."

176. The letter is misleading to clients. First, no person at NBC or NTS is eligible to represent clients at audits where he or she did not prepare the return. Thus, in many instances Real cannot provide the services promised in the letter because she did not prepare the client's tax return. Second, Form 8821 discussed in the letter does not appoint a representative to an audit. In fact, Form 8821 never uses the term "representative."

177. If the taxpayer does not agree with the recommended change after the audit, he is free to take his case to a designated

appeals officer at the IRS.

178. Unenrolled preparers, such as Real, are never permitted to represent a taxpayer in the appeals process, even if they themselves prepared the return that is at issue.

179. By virtue of his ineligibility, Cruz cannot represent taxpayers in appeals.

180. Thus, neither Cruz nor Real could provide the appellate service promised in the letter.

181. As for the actual representation letter admitted by the Government into evidence as its Exhibit 87, the audit conducted for the named taxpayers therein resulted in no change to the return. See Def. Ex. 25, p. 3.

Q. Remedial Measures

182. After the September of 2004 meeting with Leavitt, Cruz created NTS and immediately began to modify his manner of tax preparation.

183. NTS eventually implemented a new procedure that required the person inputting the taxpayer's data into the computer software to sign the return as the tax preparer.  Thus, Cruz stopped signing returns he did not prepare.

184.  NTS implemented a new procedure that required all return preparers to successfully complete the annual IRS course given on the internet prior to each tax season.

185. NTS began sending Cruz to an annual IRS-sponsored seminar

for income tax preparation.

186. NTS implemented a new procedure requiring the taxpayer to initial an instruction letter and a summary of the deductions taken on the return.  Def. Ex. 36.

187. NTS also required that each  page of the tax return to be signed by the taxpayer.

188. These added procedures are not required by the Internal Revenue Code.

189. These added procedures are not common among tax return preparers.

190. Cruz initiated these policies to reduce erroneous items on returns prepared at NTS.

191. Clients of NBC and NTS are still not required to submit an organized and documented statement of all expenses qualifying for deduction or exclusion on the tax returns prior to their appointments, and no procedure is maintained for documenting what specific information the client provides.

192. It was and remains the responsibility of the taxpayer to maintain cancelled checks, receipts, and other documentation evidencing items listed on his tax return for purposes of supporting positions taken if challenged by the IRS.

### III. <u>Conclusions of Law</u>

The United States brought this civil action under 26 U.S.C. §§ 7402(a), 7407 and 7408 to permanently enjoin Defendants from

preparing or assisting in the preparation of tax returns and from engaging in conduct that interferes with the proper administration and enforcement of the internal revenue laws. Those statutes each provide an independent authorization for an injunction.

Under § 7407, the Court may enjoin Defendants from engaging in certain prohibited conduct or from further acting as tax return preparers. Relevant to the instant action, the injunction may issue if the Court finds Defendants engaged in any of the following conduct: 1) any conduct subject to penalty under §§ 6694 or 6695; 2) misrepresenting their eligibility to practice before the IRS; or 3) engaging in any other fraudulent or deceptive conduct that substantially interferes with the proper administration of the internal revenue laws. 26 U.S.C. § 7407(b)(1). The Government alleges that Defendants engaged in all of this conduct.

Section 6694 prohibits two different types of conduct.[3] First, it prohibits a tax return preparer from taking an unreasonable position on a tax return. A position is unreasonable if the preparer knew or should have known about it, there was not a reasonable belief that the position would more likely than not be sustained on the merits, and there was no reasonable basis for the position. Second, § 6694 also prohibits a return preparer from making a willful attempt to understate a taxpayer's tax liability

---

[3] All references to § 6694 herein are to the version predating that which took effect October 3, 2008.

on the return or engaging in a reckless or intentional disregard of rules or regulations.

Section 6695(d), in relevant part, imposes a duty upon a tax return preparer to comply with § 6107(b).  Section 6107(b), in turn, requires a tax return preparer to retain a copy of each return prepared or maintain a list of the name and identification number of each taxpayer for inspection by the IRS.

As stated above, a person not a CPA or licensed attorney may represent clients at audits only if he prepared the tax return.  He may not represent the taxpayer in any case on appeal, even if he prepared the return.  Finally, a range of conduct may be considered fraudulent or deceptive and impeding of the proper enforcement of the internal revenue laws.

In order to grant relief enjoining the offending conduct, § 7407 requires the Court to find that injunctive relief is appropriate to prevent the reoccurrence of the same.  In order to issue an injunction under § 7407 that totally bars Defendants from acting as tax return preparers, the Court must further find that Defendants continually or repeatedly engaged in such conduct and that an injunction limited to prohibiting such conduct would not be sufficient to prevent their interference with the proper administration fo the internal revenue laws.  26 U.S.C. § 7407(b).

Under § 7408, the Court may issue an injunction upon a finding that Defendants engaged in any "specified conduct" and that

injunctive relief is appropriate to prevent reoccurrence of the same.  The term "specified conduct" means, in relevant part, any action or failure to act that is subject to penalty under § 6701. Section 6701 prohibits any person from aiding, assisting, or advising in the preparation of any portion of a return if he knows or has reason to believe that such portion will be used in connection with any material matter arising under the internal revenue laws and knows that such portion would result in an understatement of the taxpayer's tax liability.  Upon a finding that a person has violated § 6701 and that injunctive relief is appropriate, the Court may enjoin such conduct or enjoin any other activity subject to penalty by Title 26.  26 U.S.C. § 7408(b).

Finally, under § 7402(a), the Court has the power to issue any injunctions, writs, processes, judgments, or decrees as may be necessary or appropriate for the enforcement of the internal revenue laws.

The Government seeks only injunctive relief and thus invokes the Court's equitable power.  The decision "whether to grant or deny injunctive relief rests with the equitable discretion of the district courts, and . . . such discretion must be exercised consistent with traditional principles of equity."  eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 394 (2006).  Consistent with traditional equitable principles, a permanent injunction is warranted when (1) there has been irreparable injury, (2) damages

36

at law are inadequate, (3) a balance of the hardships weighs in favor of the injunction, and (4) the public interest would not be disserved by the permanent injunction. <u>Angel Flight of Ga., Inc. v. Angel Flight of Am., Inc.</u>, 522 F.3d 1200, 1208 (11th Cir. Apr. 4, 2008) (citing <u>eBay, Inc.</u>, 547 U.S. at 391). The scope of the injunction is likewise in the discretion of the Court. <u>Id.</u> (noting that both the decision to grant and the scope are reviewed for abuse of discretion).

Considering all these factors, the Court finds that an injunction is warranted. The evidence readily establishes that Defendants have been derelict in their duties as tax return preparers. The Court will touch upon each in turn.

Defendants' conduct calls for an injunction under § 7407(b)(1)(A). This arises from their conduct subject to penalty under § 6694(a) of preparing income tax returns based on fraudulent deductions and credits, which resulted in understatements of liability. The specifics of these improper positions taken on the returns are recounted in the Court's Findings of Fact, <u>supra</u>. Further, Defendants knew or reasonably should have known of the positions being taken in the returns that they prepared. 26 U.S.C. § 6694(a). For example, Defendants should clearly know that it is impermissible to claim a deduction for a corporate officer's compensation on a corporate tax return but fail to include that income on the shareholder's personal tax return. Defendants should

also know that vehicles should be properly depreciated as five year property instead of three year property. With respect to the § 179 deductions, Defendants also prepared returns on behalf of trucking clients that claimed deductions for major overhauls to trucks in two subsequent years. Given that Defendants prepared the returns in both years, they knew or should have known that they were claiming an improper deduction on the second year's return. These and other positions taken are all in direct contravention of the Internal Revenue Code and applicable regulations, and they have no possibility of being sustained upon audit. Therefore, during the time period in question, Defendants prepared tax returns in violation of § 6694, which subjects them to liability for injunctive relief under § 7407(b)(1)(A).

Defendants are also subject to injunction under § 7407(b)(1)(B) because they each have misrepresented their eligibility to practice before the IRS. Defendant Cruz has been barred from practice before the IRS since 1998. As a result, he is barred from participating in "all matters connected with a presentation to the Internal Revenue Service or any of its officers or employees relating to a taxpayer's rights, privileges, or liabilities under laws or regulations administered by the Internal Revenue Service." 31 C.F.R. § 10.2(a)(5). This includes corresponding with the IRS and representing a client at conferences, hearings, and meetings. Id.

Although not barred from practice before the IRS, Defendant Real is not a "practitioner" with full rights to practice before the IRS. Id. § 10.2(a)(5). Rather, Defendant Real is authorized only to conduct "limited practice" before the Internal Revenue Service pursuant to 31 C.F.R., Part 10.7(c)(1)(viii). Under that regulation, Real is authorized to represent taxpayers on whose behalf she prepared and signed a tax return, but only during an examination with respect to that tax return and only before revenue agents, customer service representatives or similar officers and employees of the IRS. 31 C.F.R. § 10.7(c)(1)(viii). The authorization specifically "does not permit [Real] to represent the taxpayer, regardless of the circumstances requiring representation, before appeals officers, revenue officers, Counsel or similar officers or employees of the Internal Revenue Service or the Department of Treasury." Id.

Thus, Defendant Cruz is not authorized to conduct any representation of taxpayers before the Internal Revenue Service, and Defendant Real is authorized only to represent taxpayers on whose behalf she prepared a return, but not in any appeals or other proceedings. Despite these clear and precise restrictions, on numerous occasions, Defendants have both misrepresented to taxpayer clients their authority to represent those taxpayer clients before the Internal Revenue Service. See supra, ¶¶ 150-180. Thus, Defendants Cruz and Real each misrepresented their eligibility to

practice before the IRS, which subjects them to liability for injunctive relief under 26 U.S.C. § 7407(b)(1)(B).

The same conduct subjects Defendants to an injunction under § 7408 because they have engaged in conduct subject to penalty under § 6701. All of the tax returns in question were prepared with the aid, assistance, or advice of Defendants. Also, Defendants plainly knew or had reason to believe that the returns would be used in connection with material matters arising under the internal revenue laws, inasmuch as they were preparing the returns for filing with the IRS. Finally, Defendants also knew that those returns containing errors would result in an understatement of tax liability. 26 U.S.C. § 6701(a). Thus, Defendants have engaged in conduct subject to penalty under § 6701, which renders them subject to injunction under 26 U.S.C. § 7408.

Based on all of the foregoing, the Court is compelled also to exercise its power under § 7402 to issue such ruling as is necessary or appropriate for the enforcement of the internal revenue laws. 26 U.S.C. § 7402(a). A stable treasury being necessary to the security of this Nation, Defendants' previous conduct requires redressing.

Notwithstanding the need for injunctive relief, the Court is unwilling to go as far as the Government seeks. The Government argues that the average tax loss calculated from the sample of 149 tax returns audited can be extrapolated to the entire population of

40

tax returns prepared by Defendants each year.  However, such extrapolation is not a fair inference to be drawn from the evidence introduced at trial.  A majority of the returns prepared by Defendants do not contain any of the items for which errors were found in the 149 returns audited.  For example, it would not be appropriate to extrapolate the average loss found on the 46 returns audited for 2003 to all 4,600 returns prepared by NBC/NTS for that year when the losses were generated by a deduction or credit that over 90% of the returns did not have.  See supra ¶ 140.  For the same reason, it would not be appropriate to extrapolate a loss to all 4,960 returns prepared by NBC/NTS for 2004 when the proposed loss was generated by a deduction or credit that over 88% of those returns did not have.  See supra, ¶ 141.

In addition, the Government seeks to hold Defendants liable for certain items on tax returns ultimately denied at audit simply because the taxpayer could not provide adequate documentation to substantiate the position.  This is improper.  The conduct alleged as supporting the injunction sought by the Government requires that Defendants act unreasonably; that is, they must have no reasonable belief that the position on the tax return would be more likely than not sustained on the merits, and there was no reasonable basis for the position.  26 U.S.C. § 6694.  There is no per se liability for a tax return preparer whose client is found to have errors on the return when the figures appear reasonable on their face.  It

41

was and remains the responsibility of taxpayer to support deductions with documentation if questioned by the IRS.

No pattern of fraudulent or deceptive conduct was established such that all returns prepared by Defendants, or even a great majority of them, can be said to suffer from the same errors as found in the sample of 149 returns.  The facts demonstrate that Defendants caused losses to the United States Treasury.  It can be fairly inferred that some of Defendants' returns not audited have the same errors on them as those in the sample of 149 returns.  Thus, it can be fairly inferred that the loss to the Untied States Treasury is greater than the sample of 149 returns demonstrates.  However, the Government's allegation that the United States Treasury lost an estimated $55 million due to Defendants' actions for tax years 2003 and 2004 alone, see Complaint, DE 1, ¶ 21, is wholly unsupported by the evidence or permissible inferences drawn therefrom.  The evidence in the record establishes that Defendants have peppered their returns with numerous mistakes resulting in losses to the United States Treasury.  It does not support the allegation that Defendants are engaged in an ongoing pattern of fraudulent conduct.

Further, the evidence does not support the allegation that Defendants have been undeterred by the preparer penalties asserted in the past or by this investigation.  Rather, the evidence clearly establishes that previously penalized positions taken by Cruz did

not resurface in the investigation made for the instant action. Moreover, after learning what areas had recurring problems, Defendants worked to seriously reduce the number of errors made on tax returns, as reflected in the rate of errors for the 149 sample returns.  See supra, ¶ 135.

Thus, an injunction is warranted under all three statutes invoked by the Government.  26 U.S.C. §§ 7407, 7408, & 7402.  What remains is consideration of the scope of the injunction.  The Court turns to the factors recited in Angel Flight, 522 F.3d at 1208.

First, the United States has suffered irreparable harm, and it is likely that it will continue to suffer irreparable harm in the absence of an injunction.  Defendants have engaged in numerous instances of conduct that violate provisions of the tax code over a period of many years resulting in losses to the United States Treasury.  The Government cannot be expected to audit every tax return filed.  Thus, there is no way to recover a portion of the losses caused by errors on Defendants' returns.  Second, the Government has no adequate remedy at law.  No Party has demonstrated what legal relief is available to the Government.  To prevent future reoccurrence of the problems highlighted above, injunctive relief is warranted.

Third, a balance of the hardships weighs clearly in favor of an injunction.  The Government proved that Defendants intentionally caused losses to the United States Treasury by their misstatements

on tax returns.  While human error is always to be expected, the internal revenue laws operate as strict rules that tax return preparers are expected to abide by.  Finally, the public interest will clearly be served by an injunction.  To the extent that an injunction aids in the reduction in the filing of erroneous returns that cause loss to the United States Treasury--and therefore, to all taxpayers--the public is served by granting injunctive relief.  Thus, to improve the status quo, an injunction is clearly warranted.  However, the question remains as to the scope of the injunction to be granted.

Defendants have clearly made a good faith effort toward eliminating the kinds of errors, and hopefully all errors, recounted in this Order.  The rate of errors uncovered by the Government's audit of the 149 returns diminished year by year, many of them precipitously.  See supra, ¶ 135.  Defendants have adopted new practices aimed to ensure the taxpayer is informed of the contents of the return and to prevent unintended errors.  See supra, ¶¶ 182-187.  In addition, a number of the errors found on the tax returns audited can be explained as simple human error.  While this does not immunize the need to recoup this loss in revenue, it lessens the culpability of Defendants.  Even the IRS makes mistakes sometimes.  See, e.g., Def. Ex. 24, p. 1, and Def. Ex. 25, p. 1 (both prepared by the Government and both listing an item in the wrong column).  Human error abounds.

Relevant to the fourth factor noted above, the public is served by having tax return preparation businesses in business. It is a rare breed that can competently navigate the intricacies of the Internal Revenue Code. Thus, the public is benefitted by having tax preparation services both available and affordable. When injunctive relief is available that can balance both the public need for tax preparation services and the need for accurate tax filings, it will be preferred over a total ban on tax preparation.

In addition, the Government's own conduct weighs against it as to the scope of the injunction to be imposed. The IRS has refrained for years before instituting any action against Defendants or imposing penalties for the errors and unreasonable positions of which they were undoubtedly aware. If the IRS was so wronged by Defendants' actions, why did it wait for the damages to be aggravated over a number of years? While the Government is not required to seek penalties and relief on a graduated basis--in other words, the statutes noted above plainly allow a first-instance permanent injunction from tax return preparation--the Court must remember that it is exercising its equitable power. The Court will not levy the business death penalty on these facts. Because of the delay in enforcement by the IRS, coupled with Defendants' impressive effort to redress the wrongs uncovered, the balance of the hardships weighs against a permanent bar from the

45

preparation of tax returns.

A first-instance injunction against prohibited conduct will be effective to prevent this conduct by these Defendants in the future.  See United States v. Gleason, 432 F.3d 678, 681 (6th Cir. 2005) (affirming the district court's denial of a permanent bar from preparing taxes based on the fact that tax preparation was the defendant's primary business and livelihood and should thus not be taken lightly).  Should Defendants engage in the conduct enjoined by the Court, not only will they be in violation of the law, they will be in violation of this Court's Order.  Different facts will surely make for a different outcome.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. The Court has jurisdiction of the Parties hereto and the subject matter herein;

2. The Court finds in favor of the Government and against Defendants; and

3. Final Judgment will be entered by separate order.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this   30th   day of December, 2008.

_____
WILLIAM J. ZLOCH
United States District Judge

Copies furnished:
All Counsel of Record